UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| LINDA G. SUMMERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 4:15-cv-00093-RLY-DML |
| | ) | |
| SALLY WHITIS, in her official capacity as the Harrison County Clerk, and HARRISON COUNTY, INDIANA, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff, Linda G. Summers, formerly worked as a deputy clerk at the Harrison County Clerk's Office. As part of that job, she was required to process marriage licenses. A few months after the Seventh Circuit affirmed this court's decision to enjoin the state of Indiana from enforcing its ban on same-sex marriage, a same-sex couple came to the Clerk's Office in hopes of securing a marriage license. Summers told her boss, Sally Whitis, that she could not process the application. Whitis replied that she was required to do so as part of her job duties, but Summers still refused. Whitis consequently processed the application herself. The next day, Summers submitted a religious accommodation request and Whitis terminated her employment for insubordination.

Summers filed this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging religious discrimination in the decision to discharge her. All parties now move for summary judgment. The court holds that Summers' religious convictions did not excuse her from performing the ministerial duties associated with

1

processing a marriage license, and therefore **GRANTS** Defendants' motion and **DENIES** Summers' motion.

## I. Background

### A. The Harrison County Clerk's Office and Summers' Job Duties

A Harrison County resident intending to marry is required to obtain a marriage license from either the Harrison County Clerk's Office or the Clerk's Office for the county in which his/her partner resides. Ind. Code §§ 31-11-4-3, 31-11-4-1. The Clerk's Office is responsible for recording marriage applications, including the licenses and certificates of marriage[1], in a book for public record. Ind. Code § 31-11-4-4(b). It is also responsible for collecting a $10.00 fee for the issuance of a marriage license, and remitting that fee to the state treasurer. Ind. Code § 33-32-5-1(a).

Sally Whitis is, and was at all relevant times, the elected Clerk of Harrison County, Indiana. (Filing No. 45-1, Deposition of Sally Whitis 5:23-25, 10:1-7). As Clerk, Whitis ran the Circuit Court Clerk's Office, the Superior Court Clerk's Office, and the Election Office. (*Id.* 14:19-25). In that role, she is and was responsible for supervising ten employees, including Summers. (*Id.* 15:7-10).

Summers worked in the Superior Court Clerk's Office as a deputy clerk. (*Id.* 21:18-25, 22:19-23). She had various duties in that position, including processing

---

[1] A marriage license legally authorizes an individual who can solemnize marriages (e.g., a member of the clergy, judge, or mayor) to perform a valid marriage ceremony for a particular couple within sixty days. Ind. Code §§ 31-11-4-10, 31-11-4-14, 31-11-6-1. In contrast, a marriage certificate is completed *after* the ceremony takes place; it certifies that the couple was actually married after first obtaining a license. Ind. Code. § 31-11-4-15.

marriage licenses. (*Id.* 22:19-23:10). In order to process a marriage license, Summers had to pull up the application (which was completed online by the couple prior to coming to the Clerk's Office), verify that the application was complete, and then print the license. (Filing No. 45-2, Deposition of Linda Summers 39:16-40:1). In her deposition, Summers agreed that, when it came to processing marriage licenses, her duties essentially boiled down to "input[ing] the information and giv[ing] the forms out." (*Id.* 114:11-13). She did not solemnize marriages, nor did she personally sign the marriage license or certificate. (*Id.* 114:5-10).

### B. The Clerk's Office's Adjustment to Indiana's Recognition of Same-Sex Marriages

On September 4, 2014, the Seventh Circuit Court of Appeals held that Indiana's refusal to allow same-sex couples to marry violated the Equal Protection Clause of the Fourteenth Amendment. *Baskin v. Bogan*, 766 F.3d 648, 672 (7th Cir. 2014). Shortly thereafter, on October 6, the Supreme Court denied Indiana's petition for writ of certiorari, making the Seventh Circuit's ruling final. *Bogan v. Baskin*, 135 S. Ct. 316 (2014).

On that same day, the Office of the Indiana Attorney General issued a memorandum to all elected Clerks, stating, in relevant part:

> Today the U.S. Supreme Court announced that it had denied the state's request to hear an appeal of the decision made last month by the 7th Circuit Court of Appeals. That denial of the state's request means that the 7th Circuit will issue a "mandate" very soon that will implement the injunction issued by Chief Judge Young in June. As soon as that mandate is issued—and it could be as early as today—county clerks will be prohibited from denying marriage licenses to same sex couples so long as all other marriage license requirements are met. It would be advisable to start making necessary

>     preparations to process marriage license applications and issue licenses accordingly.

(Filing No. 45-3, Attorney General Memorandum).

On October 22, Whitis sent an e-mail to all Clerk's Office employees, including Summers, stating:

>     While I was on vacation, the Supreme Court has ordered Indiana to proceed with gay marriages.
>
>     Therefore, it is our duty in the Clerk's Office to process those applications. The process in Incite[2] has been modified to accommodate these filings.
>
>     Even though it may be against your personal beliefs, we are required by state law to process their applications. We are only doing the paperwork and not performing their ceremony.
>
>     I expect everyone to please comply. Thanks.

(Filing No. 45-4, Whitis E-Mail).

### C. Summers' Refusal to Process a Marriage License for a Same-Sex Couple

On December 8, 2014, a same-sex couple came to the Superior Court Clerk's Office and requested a marriage license from Summers. (Summers Dep. 59:24-25). Summers noticed that one of the individuals was a woman, but "didn't pay too much attention" to the other person. (*Id.* 60:2-17). She went to her computer, opened the Incite system, and pulled up the couple's application. (*Id.* 60:17-18). She then realized that the individuals requesting the marriage license were of the same sex. (*Id.* 60:18).

Summers hesitated, unsure what to do. (*Id.* 64:4-5). After a moment, she decided that she could not process the application and motioned for Whitis to come and assist.

---

[2] Incite is the computer system used to process marriage licenses. (Whitis Dep. 28:1-4).

4

(*Id.* 64:8-10). With regard to the conversation Summers and Whitis then had, Summers testified as follows:

> Summers: I told her this is a same-same-sex marriage license, and I can't do it.
>
> Counsel: And what was her response?
>
> Summers: She said, "You are not marrying them; you're just providing with them with the license." And I said, "I don't feel that way." And I said, "I can't do it." And she says, you're required to do it, you have to do it–some of that order. And I said, "I'm sorry. I can't do it." And she—that's when she jerked the paper out of my hand–I had the divorce paper in my hand–and she took it and sat down at her desk and took the couple.

(*Id.* 65:6-16). Whitis then processed the marriage license herself. (Whitis Dep. 33:15-16). Once the couple left the office, Whitis told Summers that such a refusal "could not happen again, because it was her job to do those." (*Id.* 33:19-21).

### D. Whitis' Decision to Terminate Summers

Later that afternoon, Whitis reviewed the Harrison County Personnel Policies Handbook (the "Handbook"). (*Id.* 37:17-19). The Handbook–which Summers acknowledges she received–includes a list of "Group Three Offenses," and notes that these offenses are punishable by termination of employment. (Filing No. 45-6, Handbook at 64-65; Summers Dep. 89:4-11). "Group Three Offenses" include "[i]nsubordination by refusing to perform assigned work or to comply with written or verbal instructions of supervisors." (Handbook at 64).

After reviewing the Handbook, Whitis made the decision to terminate Summers for insubordination. (Whitis Dep. 37:17-19, 43:15-19). She then consulted with the County Attorney and the County Auditor on how to proceed with the termination process.

(*Id.* 43:20-25; Filing No. 45-7, Affidavit of Harrison County Attorney Christopher L. Byrd ¶¶ 4, 7; Filing No. 45-8, Affidavit of Sally Whitis ¶ 4). Whitis conferred with these individuals to ensure she was following the policy of Harrison County in terminating Summers and that her termination letter was handled properly. (Whitis Dep. 46:23-47:9). In her deposition, Whitis testified that Summers' religious beliefs did not play any part in the decision to terminate her. (*Id.* 44:1-3).

### E. Summers' Religious Accommodation Request and Termination

On the evening of December 8, Summers drafted a handwritten letter to Whitis asking for a religious accommodation. (Summers Dep. 69:4-9, 80:9-81:1). She typed it on a computer in the Clerk's Office the next morning, on December 9. (*Id.* 80:14-81:5). In the letter, Summers stated, "I am respectfully asking that you, my employer, accommodate my sincerely held religious belief by not requiring me to perform the task of processing marriage license for same sex couples [sic]." (Filing No. 45-9, Religious Accommodation Request). She placed the letter on Whitis' desk. (Summers Dep. 82:12-16). At no point in time prior to delivering that letter to Whitis on December 9 did Summers request a religious accommodation. (*Id.* 133:7-16).

Whitis read the letter when she arrived at the Clerk's Office later that morning. (Whitis Dep. 32:9-19; Summers Dep. 84:5-13). She subsequently gave Summers a letter notifying her that her employment with the Clerk's Office was terminated "due to insubordination, as is defined in the Handbook on page 64." (Summers Dep. 86:18-22; Filing No. 45-10, Termination Letter). Summers was insubordinate because "she refused

to do a task that she was asked to do," namely, process a marriage license. (Whitis Dep. 37:20-38:2).

### F. Summers' Religion

Summers identifies as a Christian. (Summers Dep. 126:24-25). She maintains that she could not process marriage licenses for same-sex couples because it was "against God's law" to do so, and God's law is "above legal law." (*Id.* 132:4-7, 145:24). Based upon her interpretation of select chapters in the Christian Bible (specifically Leviticus 18, Romans 1, Genesis 1 and 2, and 1 Corinthians 2), Summers believes that "it's not God's law to have them marry." (*Id.* 127:19-20, 132:2-3). She asserts that after reading the Bible, listening to her pastor's sermons, and praying, she "felt led" to refuse to process marriage licenses for same-sex couples. (*Id.* 128:4-11).

In her deposition, Whitis testified that (a) she did not treat Summers any differently because of her religious beliefs, (Whitis Dep. 44:4-6), and (b) she did not apply any policies differently to Summers because of her religious beliefs. (*Id.* 44:7-9).

## II. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering Summers' motion, the court considers the facts in the light most favorable to Defendants; when considering Defendants' motion, the facts are considered in the light most favorable to Summers. *First State Bank v. Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009).

**III. Discussion**

Title VII makes it unlawful for an employer "to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). This protection was designed to ensure that employees would not be forced into a "spot where they must choose between their religious convictions and their job." *EEOC v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1120 (10th Cir. 2013), *rev'd*, 135 S. Ct. 2028 (2015).

Until recently, a plaintiff attempting to establish a *prima facie* case of religious discrimination based on an employer's failure to provide reasonable accommodation had to show: (1) "the observance or practice conflicting with an employment requirement is religious in nature"; (2) "she called the religious observance or practice to her employer's attention"; and (3) "the religious observance or practice was the basis for her discharge or other discriminatory treatment." *EEOC v. Ilona of Hung.*, 108 F.3d 1569, 1575 (7th Cir. 1997). Once the plaintiff had established a *prima facie* case of discrimination, the burden shifted to the employer to (1) rebut one or more elements of the claim, (2) show that it offered a reasonable accommodation, or (3) show that an accommodation of the employee's religious needs would result in undue hardship. *Id.* at 1575-76.

Both parties offer this framework in their briefing, but the Supreme Court revised the elements for this claim in *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015). In that case, the Court rejected Abercrombie & Fitch's argument "that an applicant cannot show disparate treatment without first showing that an employer has 'actual knowledge' of the applicant's need for an accommodation." *Id.* at 2032. Instead, the Court held that "[a] request for accommodation, or the employer's certainty that the

8

[religious] practice exists . . . is not a necessary condition of liability." *Id.* at 2033. Therefore, an employee "need only show that his need for an accommodation was a motivating factor in the employer's decision." *Id.* at 2032.

The Supreme Court's decision effectively reduces the *prima facie* case to two elements. A plaintiff must now show: (1) her religious belief or practice conflicted with an employment requirement, and (2) her need for an accommodation of that religious belief or practice was a motivating factor in the employer's adverse employment decision. *Schwingel v. Elite Prot. & Sec., Ltd.*, No. 11 C 8712, 2015 U.S. Dist. LEXIS 161858, at *16 (N.D. Ill. Dec. 2, 2015); *EEOC v. JetStream Ground Servs.*, 134 F. Supp. 3d 1298, 1318 (D. Colo. 2015).

Summers maintains that summary judgment in her favor is warranted because the undisputed evidence shows that she has established a *prima facie* case and Defendants are unable to prove that accommodating her religious beliefs would have resulted in undue hardship. Defendants contend just the opposite. They dispute the existence of both elements and also maintain that offering an accommodation would have created an undue hardship. The court finds that Summers cannot satisfy the first element of her claim, and therefore does not address the balance of the parties' arguments.

### A. First Element of the *Prima Facie* Case

An employer is only required to accommodate an employee "when a neutral rule of general applicability conflicts with the religious practices of a particular employee." *TWA v. Hardison*, 432 U.S. 63, 87 (1977) (Marshall, J., dissenting). *See Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 76 (1986) (Stevens, J., concurring in part and dissenting

9

in part) ("First, the court must ask whether the employee's job obligations are in conflict with his religious obligations."). If the employee fails to show a *bona fide* conflict, "it makes no sense to speak of a duty to accommodate." *Id.*

Assessing whether a genuine conflict exists requires an objective analysis. In other words, the fact that an employee subjectively perceives a conflict between her religious beliefs and her job duties is not, in and of itself, conclusive. *See Bush v. Regis Corp.*, 257 F. App'x 219, 221 (11th Cir. 2007) ("Bush argues that the Sunday shift prevented her from doing field service with her family, which constituted a bona fide religious belief. The record, however, indicates that field service was not required to be performed on Sundays; rather, that was the day Bush and her family wished to perform field service."); *Tiano v. Dillard Dep't Stores*, 139 F.3d 679, 683 (9th Cir. 1998) (holding that the employee's religious belief–that she "had a calling from God" to take a pilgrimage to Medjugorje, Yugoslavia in October–was not in conflict with Dillard's "no-leave policy" for October through December because "the timing of the trip was a personal preference and not part of her calling").

If this element was purely subjective, there would simply be no reason to have it as part of the *prima facie* case. Thus, the court must be able to conduct a limited, objective inquiry into the purported conflict.

### B. Whether Summers' Religious Beliefs Conflict with an Employment Requirement

Here, the court finds no objective conflict between Summers' duties as a deputy clerk and her religious opposition to same-sex marriage. When it came to marriage

licenses, Summers' job merely required her to *process* the licenses by entering data and handing out information. Specifically, she had to pull up the application, verify that certain information was correct, collect a statutory fee, print a form, and record the license in a book for public record. At bottom, she was simply tasked with certifying–on behalf of the state of Indiana, not on her own behalf– that the couple was qualified to marry under Indiana law. The duties were purely administrative.

To be clear, Summers did not perform marriage ceremonies or personally sign marriage licenses or certificates. She was not required to attend ceremonies, say congratulations, offer a blessing, or pray with couples. Her employer did not make her express religious approval or condone any particular marriage. Summers remained free to practice her Christian faith and attend church services. She was even free to maintain her belief that marriage is a union between one man and one woman. Thus, she was not forced to "choose between [her] religious convictions and [her] job." *Abercrombie & Fitch Stores*, 731 F.3d at 1120.

The court's conclusion is supported by *Miller v. Davis*, 123 F. Supp. 3d 924 (E.D. Ky. 2015), *vacated by* Nos. 15-5880, 15-5978, 2016 U.S. App. LEXIS 13048 (6th Cir. July 13, 2016) (dismissing appeal as moot due to new law that resolved the dispute). In *Miller*, the U.S. District Court for the Eastern District of Kentucky preliminarily enjoined Rowan County Clerk Kim Davis from enforcing her policy of not issuing marriage licenses to any couple. *Id.* at 944. As part of her opposition to the motion for injunctive relief, Davis asserted that requiring her to issue marriage licenses to same-sex couples in spite of her sincerely-held religious beliefs (a) violated her First Amendment right to free

11

speech and (b) constituted a religious test in violation of Article VI, § 3 of the U.S. Constitution. The district court disagreed with both arguments, concluding,

> [I]ssuing a marriage license to a same-sex couple merely signifies that the couple has met the legal requirements to marry. It is not a sign of moral or religious approval. The State is not requiring Davis to express a particular religious belief as a condition of public employment, nor is it forcing her to surrender her free exercise rights in order to perform her duties.

*Id.* at 943. *See id.* at 941 ("The form does not require the county clerk to condone or endorse same-sex marriage on religious or moral grounds. It simply asks the county clerk to certify that the information provided is accurate and that the couple is qualified to marry under Kentucky law.").

While the opinion in *Miller* was vacated by the Sixth Circuit and the district court was addressing constitutional claims (i.e., not a Title VII claim), the court finds the reasoning persuasive because the material facts in that case are identical to those of this case. Specifically, the court agrees that processing a marriage license "is not a sign of moral or religious approval." *Id.* at 943. Moreover, by simply issuing a license, a deputy clerk like Summers does not "condone or endorse same-sex marriage." *Id.* at 941.

The court's decision herein also finds support in *Garman v. United States Postal Serv.*, 509 F. Supp. 507 (N.D. Ind. 1981). In *Garman*, a United States Postal Service employee filed suit against his employer after he was ordered to complete certain duties that allegedly ran afoul of his religious beliefs. *Id.* at 508. The Postal Service had ordered all window clerks to begin "perform[ing] various ministerial tasks connected with the Selective Service registration." *Id.* Specifically, employees were required to distribute registration forms, review completed forms, and forward completed forms to a

processing center. *Id.* The plaintiff opposed military service because of his religious beliefs, and was recognized as a conscientious objector by the Selective Service more than ten years prior to the suit. *Id.* at 510. Because of those religious convictions, he maintained that forcing him to process Selective Service registration forms for others violated his First Amendment rights.

In denying the plaintiff's motion for a preliminary injunction, the *Garman* court concluded that this requirement on window clerks was "neutral in its purpose of providing assistance of a technical nature for Selective Service registration and [wa]s not designed to control, nor d[id] it have the effect of controlling, political or religious belief or expression." *Id.* After finding that "the act of registration with the Selective Service is not an interference with the free exercise of one's religion," the court concluded that the plaintiff would not prevail on the merits of his claim that requiring him to process registration forms violated the First Amendment. *Id.* at 511.

While *Garman* presents different legal claims, the facts of that case are very similar to those of the instant case because both the *Garman* plaintiff and Summers alleged that requiring them to process certain forms violated their religious beliefs. The same rationale applies to both cases. Whitis' order to process the marriage license was "neutral" in that the ministerial duties associated with processing a license only "provid[e] assistance of a technical nature" to couples. *Id.* Thus, requiring Summers to

13

process marriage licenses for same-sex couples did not interfere with her religious freedom.[3]

To be clear, the court does not question the sincerity of Summers' beliefs. She maintains that "it's not God's law to have [same-sex couples] marry," (Summers Dep. 132:2-3), and has pointed to select verses from the Bible in support. That is fine; she has every right to believe that. However, that belief, no matter how sincerely espoused, does not objectively conflict with the purely administrative duty to process marriage licenses. Summers' desire to avoid handling forms related to activities of which she personally disapproves is not protected by federal law. Title VII is not a license for employees to perform only those duties that meet their private approval.

Therefore, the court holds Summers has failed to establish that her religious practices were in conflict with her duties as a deputy clerk. This is fatal to her claim under Title VII. Summary judgment for Defendants is required.

## C. Finding in the Alternative

For purposes of appeal, the court offers a finding in the alternative. Assuming, *arguendo*, that Summers has established a religious conflict, that conflict was with federal law, not an employment requirement. While Whitis may have instructed Summers to process same-sex marriage licenses, that directive was merely an effort to comply with the Seventh Circuit's mandate, which expressly forbid the state of Indiana from enforcing its same-sex marriage ban. In other words, the requirement that Summers

---

[3] The court also notes that while Defendants relied upon both *Miller* and *Garman* in their briefing, Summers made no attempt to distinguish either case.

process same-sex marriage licenses was one imposed by a federal court and merely implemented by Defendants. Therefore, Summers' dispute was not with her employer, but with the Seventh Circuit. *See Seaworth v. Pearson*, 203 F.3d 1056, 1057 (8th Cir.) (per curiam), *cert. denied*, 531 U.S. 895 (2000) (where applicant refused to provide his Social Security Number to employer because it violated his religion, employer did not unlawfully discriminate in failing to hire because "the IRS, not defendants, imposed the requirement that Seaworth provide an SSN. Thus, Seaworth's beliefs do not conflict with an employment requirement"). *See also Bey v. Oakton Cmty. Coll.*, No. 14 C 06655, 2015 U.S. Dist. LEXIS 131877, at *22 (N.D. Ill. Sep. 30, 2015) ("Courts have regularly held that failing to hire . . . a candidate who refuses to provide his SSN on religious grounds is not discriminatory because the requirement of providing a SSN is the government's, not the employer's . . . .") (collecting cases).

## IV. Conclusion

In the end, Summers should have put her personal feelings aside and heeded the command of her employer. She was certainly free to disagree with the Seventh Circuit's decision, but that did not excuse her from complying with it. When Summers refused to process a marriage application for a same-sex couple, Defendants were within their rights to terminate her employment as a deputy clerk for insubordination.

Therefore, Defendants' Motion for Summary Judgment (Filing No. 43) is **GRANTED** and Summers' Motion for Summary Judgment (Filing No. 38) is **DENIED**.

**SO ORDERED** this 15th day of December 2016.

                                                RICHARD L. YOUNG, JUDGE
                                                United States District Court
                                                Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.